UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ADAM WALTON | No. 20 CR 265<br><br>Judge Sara L. Ellis |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant ADAM WALTON's motion to suppress. For the reasons stated below, defendant's motion should be denied following an evidentiary hearing. The government's evidence will establish that officers had probable cause to believe defendant's vehicle contained contraband and evidence of criminal activity, as well as a reasonable belief that defendant was dangerous and might gain immediate control of a weapon. Accordingly, their search complied with the Fourth Amendment.

## I. FACTUAL BACKGROUND

The death of George Floyd on May 25, 2020 sparked protests and civil unrest across the country, including Chicago. The weekend of May 29 saw not only large public demonstrations, but also widespread burglary, theft, looting, and property

damage.[1] In response to the criminal activity, Chicago Mayor Lori Lightfoot imposed a city-wide curfew on May 30 that prohibited "any person" from "remain[ing] in any public place or on the premises of any establishment" between 9:00 p.m. and 6:00 a.m. Ex. 1. The order defined "public place" as "any place to which the public ... has access," including "the common areas of ... shops," and "establishment" as "any privately owned place of business operated for a profit to which the public is invited." *Id.*

On May 31, at approximately 11:45 p.m.—nearly three hours after the nightly curfew went into effect—defendant, his girlfriend, Individual A, and several others looted an Old Navy store located in Marshfield Plaza, a shopping center on the city's south side. Exs. 2-4. According to surveillance footage, defendant and Individual A entered through the front door while broken glass and merchandise was strewn throughout the entryway. Ex. 4A at 43:59.

---

[1]  *See, e.g.,* https://www.chicagotribune.com/news/breaking/ct-viz-george-floyd-protest-chicago-timeline-20200531-lfkd7p6ejbennfezhxk2u5kkmm-story.html (last visited May 4, 2021).



*Id*. Defendant remained inside the store for over two minutes and collected a large armful of clothing.



Ex. 4B at 46:30.

Meanwhile, unbeknownst to defendant, Chicago police officers Brandon McDonald, Kevin Paruszkiewicz, Monica Richardson, and Edwin Diaz were

conducting a vehicle patrol through Marshfield Plaza. Exs. 2-3. This was not their first visit to the plaza that day. The government anticipates the officers will testify that they observed looted plaza stores during earlier patrols, and that by nightfall several businesses had broken windows and merchandise scattered throughout parking lot.

As the officers proceeded through the plaza, they saw multiple looters exit stores with merchandise, run to vehicles, and flee the scene. As the officers approached the Old Navy, defendant exited the store with his stolen clothing[2]:



---

[2] Surveillance footage shows the flash of the emergency lights on the officers' squad car as defendant exited the Old Navy. *See* Ex. 4A at 46:34-46:36.

4



Ex. 4A at 46:35, 46:41. The officers observed defendant exit the Old Navy, run to a Honda CR-V parked in front of the store, and unsuccessfully try to open the driver's door. They then watched him drop the stolen merchandise and run through the plaza parking lot, leaving his car behind.[3]

The officers exited their squad car and remained by defendant's abandoned vehicle. Through the windows of the CR-V, they observed large quantities of what appeared to be additional stolen merchandise. Defendant returned to his car approximately five minutes later from the same direction he had fled. Individual A

---

[3] Individual A exited the Old Navy a few minutes after defendant, at approximately 11:50 p.m. Ex. 4A at 48:24.

followed shortly thereafter but remained 10-15 feet away from the officers and defendant.[4]

The government anticipates that the officers will testify that they instructed defendant to remove the stolen items from his vehicle. Defendant responded that he did not care about the merchandise, did not want to go to jail, and just wanted to retrieve his car and leave. He told the officers, "you all can have everything," or words to that effect. He then moved closer and said he needed to tell the officers something. The officers initially rebuffed his advance, but after he insisted, allowed him to approach. Defendant then told Officer McDonald, "I have a gun in the car" and said it was on the driver's side floorboard.

Officer McDonald is expected to testify that he directed defendant to unlock the CR-V and entered the driver's door. Officer McDonald did not see a firearm on the floorboard, but defendant maintained that the gun should be where he said. Officer McDonald then observed a pile of stolen merchandise on the center console between the driver and passenger seats. When he moved the merchandise out of the way, he saw a Walther P22 semiautomatic handgun in the center cup holder.

After Officer McDonald recovered the firearm and returned to his squad car, defendant stated that he previously had several gun cases, was on parole, and did not

---

[4] Exhibit 5 is surveillance footage from a Jewel-Osco located south of the Old Navy in Marshfield Plaza. The footage shows a portion of the plaza parking lot, but not the spot where defendant's vehicle was parked. Around the time CPD arrived at the scene, the footage shows multiple individuals running from the direction of the Old Navy and heading south and southeast through the parking lot. Ex. 5 at 11:48:00-11:49:30. Approximately five minutes later, the footage further shows an adult male resembling defendant walking back north through the parking lot, followed by an adult female resembling Individual A. *Id.* at 11:56:20-11:57:00.

want to go back to jail. Defendant also said words to the effect of, "I know I shouldn't have a gun," "I'm on parole for a gun," and "please tell me you're not going to arrest me. I was honest." Officer McDonald later returned to the CR-V and discovered a case of .22 caliber long-rile ammunition in the glove compartment. The officers then placed defendant under arrest.

Additional officers responded to the scene to transport defendant to the police station. Ex. 6. When they arrived, the in-car camera from their transport vehicle captured large amounts of stolen merchandise next to defendant's open CR-V:



*Id.* at 1:45. When the transport officers departed, their in-car camera also captured more looters as they continued to run from plaza stores and flee. *Id.* at 5:45-6:52.

After the officers removed the stolen merchandise from defendant's vehicle, they gave the keys to Individual A and allowed her to leave.

## II.    PROCEDURAL HISTORY

On June 3, 2020, defendant was charged by criminal complaint with unlawful possession of a firearm by a conviction felon, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. He was indicted for the same offense on July 2, 2020. Dkt. 5. On March 23, 2021, he moved to suppress the firearm and ammunition found in his car and his subsequent statements to police, arguing that the officers' search violated the Fourth Amendment. Dkt. 39.

## III.    ANALYSIS

### A.    Officers Possessed Probable Cause that Defendant's Vehicle Contained Contraband and Evidence of Criminal Activity.

"[W]here there is probable cause to believe that a vehicle contains contraband or evidence of a crime, law enforcement may conduct a warrantless search of the vehicle." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009). "Probable cause exists when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014) (quoting *United States v. Richards,* 719 F.3d 746, 754 (7th Cir. 2013)). "The test for probable cause is not reducible to 'precise definition or quantification,'" and "'[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence … have no place in the [probable-cause] decision.'" *Florida v. Harris*, 568 U.S. 237, 243-44 (2013) (first quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003), then quoting *Illinois v. Gates,* 462 U.S. 213, 235 (1983)) (first alteration added). In the end, the law requires only "the kind of 'fair probability' on which 'reasonable and

8

prudent [people,] not legal technicians, act.'" *Id.* at 244 (quoting *Gates*, 462 U.S. at 231, 238) (alteration in original). The inquiry in an objective one; an officer's subjective beliefs are "largely irrelevant." *United States v. Garcia-Garcia*, 633 F.3d 608, 612-13 (7th Cir. 2011).

Here, officers had probable cause to believe both contraband and evidence of criminal activity were inside defendant's vehicle. Lawbreaking was rampant in multiple parts of the city on the night of defendant's arrest, and the officers had observed heavy looting and property damage at Marshfield Plaza earlier in the day. By the time they entered the plaza on their last patrol, normal business hours had long expired and the city's curfew was well in effect. As they approached the Old Navy, they saw multiple looters exiting stores with stolen merchandise, running to vehicles scattered throughout the parking lot, and fleeing. This scene was indicative of criminal activity. *See Pleasants v. Town of Louisa*, 524 F. App'x 891, 897 (4th Cir. 2013) ("Whether probable cause exists must be determined 'in the light of all of the surrounding circumstances.'") (quoting *Porterfield v. Lott,* 156 F.3d 563, 569 (4th Cir. 1998))). It was in this context that the officers further saw defendant exit the looted Old Navy with an armful of clothing and run to his CR-V. Once he fled, they noticed what appeared to be more stolen merchandise through the CR-V's window**s**. Then, after defendant returned to the vehicle, he informed Officer McDonald there was a gun in the car. Collectively, these facts provided ample basis for a reasonably prudent person to believe that defendant had violated the curfew order, *see* Chi. Mun. Code § 2-112-340; Ex. 1, and multiple criminal statutes, including retail theft, *see* 720 Ill.

9

Comp. Stat. § 5/16-25, burglary, *see id.* § 5/19-1, looting, *see id.* § 5/25-4, and unlawful possession of a firearm. *See id.* § 5/24-1. The same circumstances provided a reasonable basis to conclude that evidence of those crimes was present in his vehicle.

Defendant's arguments to the contrary fail. He first asserts that because he never entered his vehicle after exiting the Old Navy, and dropped the stolen clothing before fleeing on foot, the officers "had no basis to believe that any stolen merchandise was *in* the car." Dkt. 39 at 7 (emphasis added). This claim will be contradicted by the testimony of the officers, who not only observed suspected stolen goods inside the CR-V, but also heard defendant say he did not care about the items, "you all can have everything," and that he just wanted to retrieve his car and leave. The officers' observations are corroborated by in-car camera footage that captured large amounts of merchandise piled outside defendant's vehicle—notably, more than what surveillance footage showed him physically carry from the Old Navy.

In any event, even absent the officers' observations of stolen goods inside the car, the officers still watched defendant exit the looted Old Navy after curfew with an armful of merchandise and run to the CR-V before fleeing. They therefore would have had probable cause to search the car for burglary tools, including weapons, as well as evidence of defendant's identity. It also was reasonable to suspect that defendant may have made multiple trips inside the Old Navy or other stores prior to their arrival, and that loot may have been hidden inside his vehicle.

Defendant further denies telling Officer McDonald that he had a firearm. Dkt. 39 at 5. This assertion will be also rebutted by the evidence. Officer McDonald is

expected to testify that defendant told him there was a gun in the car. His testimony will be supported by other officers who saw defendant approach Officer McDonald and say that he needed to speak with him. It will also be corroborated by defendant's own statements in recorded jail calls since his arrest. For example, in a recorded call on June 3, 2020, defendant discussed the incident with Individual A:

> Defendant: "then my momma, my momma sitting there cursing me, like, my momma sitting there cursing me out like, 'Why the fuck would you, why the fuck would you take, why the fuck would you take that gun? Why didn't you let G [a nickname for Individual A] just take it?'…"
>
> …
>
> Defendant: "So then my momma. Ma. I just got done talking with my momma, she was like, 'Why didn't you let G?' I talked to her, she like, 'Well,' she like, 'Well I gotta call, I gotta call [Individual A] back cause [Individual A] said she was gonna come to court and tell them that that wasn't…' You know what I'm saying? …
>
> …
>
> Defendant: I'm like, 'Man they wasn't, they wasn't listening. Them police weren't listening.'"
>
> Individual A: "Nah, they wasn't."
>
> Defendant: "They talking about, 'You got a FOID [Firearm Owners Identification] card?' I'm saying like, 'That's not my gun, sir.' I'm like, '*There's a gun in the car but it's not mine.*'"[5]
>
> Individual A: "Um huh."
>
> Defendant: "You know what I'm saying? They're like, 'You got a FOID card?' I'm like, 'A FOID card for what? It's not my fucking gun.' So then they got, they got—"

---

[5] To be clear, the government does not expect Officer McDonald to testify that defendant disclaimed ownership of the firearm. Indeed, defendant instead told the officers, "I know I shouldn't have a gun," or words to that effect. Exs. 2-3. Nonetheless, on the predicate issue of whether defendant alerted the officers to the presence of a firearm, his partially revisionist admissions are telling, particularly given the opposing stance presented in his motion.

Individual A: "Right"

Defendant: "They got all that in the paper [police reports], they got all that in the paper, but they ain't got me sayin' ... they got me saying, I'm like, '*Man, there's a gun in the car*, but it's my, it's my wife's car, it's my wife's gun.' He don't got that."

Individual A: "Right."

Defendant: "He don't got that. He's just got me walking up saying, 'There's a gun in the car.'"

Individual A: "Yeah. Come on. Cause you're being recorded."

Defendant: "Yeah. But he ain't, he ain't got that shit. He ain't got me saying, 'It's my wife's gun.' I'm like, '*Man, there's a gun in the car*. That's my, that's my wife's gun.'"

Individual A: "Right."

Defendant: "You know what I'm saying?"

Ex. 7A at 1:45-3:28; Ex. 7B (emphasis added). In another recorded call on June 4, 2020, defendant had the following conversation with his mother:

Defendant: "When I just left my parole board, they like, 'Do you have any witnesses that can verify that this gun wasn't yours, or it was theirs, or...' And I'm like, 'Yeah, that's my wife's gun.' So I put her phone number down as a witness for them to call and ask her, and I put you down as a witness."

Defendant's Mother: "Okay (mumbles)."

Defendant: "Cause then like, even when you was hollering through the phone, like, 'Why did you, why did you take that for her?' Ma, they [the police] put it on me. You know what I'm saying? They didn't. She, She, She, they weren't trying to hear shit."

Defendant's Mother: "Okay."

Defendant: "You know what I'm saying? You were, 'Why did you take, why did you take the case for her?' I didn't take the case for her, they basically gave me the fucking case. And like I say, when they lying.

> *'Cause when I walked back up on the fucking car, they said, 'Is there any contraband in the fucking car?' I said, 'I got a little motherfucking marijuana in there.' Then that's when motherfucking [Individual A] was like, 'Oh, shit baby, I do got my …' I'm like, 'What?' I'm like, 'Man, my wife talking about there's a gun there.'* I'm like, 'It ain't mine though. But my wife, she's got her FOID card.'"[6]

Ex. 8A at 9:30-10:50; Ex. 8B (emphasis added).

Defendant's admission to Officer McDonald is further verified in recorded calls before and after Individual A's testimony before a federal grand jury. As context, following defendant's arrest, he participated in multiple conversations where he advocated Individual A claiming ownership of the firearm in an affidavit. During a call with his mother on June 3, 2020, for example, defendant stated, "Listen, y'all gonna have to go to the currency exchange, ma. … [S]he [Individual A] need to go to the currency exchange and sign an affidavit. And have them notarize it." Ex. 9A at 1:48-2:18; 9B. When his mother asked, "For what?" defendant responded, "What you mean, 'For what?' Stating that, stating that that was her—that's not my gun, ma. Stating that I had, stating that I had no knowledge. That was her gun…." *Id.*

When Individual A later informed defendant she had been subpoenaed for federal grand jury testimony, defendant told her, "Oh my god, man. You lying. … Yeah, before you go to court make sure you go get that affidavit and shit." Ex. 10A at 1:17-3:22; Ex. 10B. In the days leading to Individual A's testimony, defendant voiced concerns about her loyalty. He asked his mother, "Are you going to court with that girl?" Ex. 11A at 2:00-2:50; Ex. 11B. When she said no, he responded,

---

[6] According to law enforcement databases, Individual A did not possess a FOID card at the time of defendant's arrest.

"Oh shit. … Aight, shit. Man this serious, man, I need somebody to go with her, man, to keep her on her toes. You never know what she going down there for. Shit. … Oh, what the fuck … I don't want her to go down there and have no change of heart or nothing, man. I need someone to be with her on my side of the family, other than just her family who know what's going on." Ex. 11A at 2:00-2:50; Ex. 11B.

In a recorded call that occurred on the day of Individual A's testimony, defendant told an unknown individual, "My motherfucking wife in court right now. The feds went to her crib and motherfucking subpoenaed her to court." Ex. 12A at 1:53-2:49; Ex 12B. Later, he stated, "You know, Wifey was gonna go ahead and do the move until the motherfuckin' feds came and knocked on her door. … *Man I'm not playing with no guns no more Drizzy.*" Ex. 12A at 13:35-14:23; Ex. 12B (emphasis added).[7] During the same recorded call, defendant started a three-way conversation that included Individual A after she left the grand jury. Individual A told defendant, "They got that tape … They got that video," and said she had been shown a small portion of police footage from the incident. Ex. 12A at 18:17-19:02; Ex. 12B. She also said she had not accepted ownership of the firearm. *Id.* Defendant responded, "Damn man! … That was the only thing that was gonna save my ass." Ex. 12A at 19:02-19:11; Ex. 12B.

Individual A then told defendant, "I didn't hear you tell them that that was your gun. That's what they asked." Ex. 12A at 19:12-19:17; Ex. 12B. Defendant

---

[7] The government interprets "do the move" as a reference to defendant's plan to have Individual A claim ownership of his firearm.

responded, "I know why the fuck they asked you that though." Ex. 12A at 19:17-19:23; Ex. 12B. Individual A replied, "*Cause it's on the tape!*" Ex. 12A at 19:23-19:26; Ex. 12B (emphasis added). Individual A told defendant that "they got the fucking body camera" and that the footage was "gonna show everything." Ex. 12A at 19:26-19:40; Ex. 12B. She then stated, "*But you know, what was said while they was right there with the body cam, right?*" Ex. 12A at 19:45-19:50; Ex. 12B (emphasis added). She repeated, "*You know what was said to them while they was on, while it was on body cam, right? You forgot what you, what was said?*" Ex. 12A at 19:55-20:02; Ex. 12B (emphasis added). When defendant asked if Individual A was shown that part of the footage, Individual A responded, "Didn't I just say they didn't, *but I'm just knowing it's on there.* … I know they have the tape, babe. They're not gonna show me that part because I don't got nothing to do with that part. … But I'm just reminding you." Ex. 12A at 20:07-20:18; Ex. 12B (emphasis added).

Defendant got upset and said, "Fuck. It's over with, man. Damn! Fuck man! … Man them motherfuckers, they couldn't even do shit to you anyway bae. My soul, you ain't got no background or nothing man. They couldn't even touch you, foe. … If you would've said, 'Yeah,' [accepted ownership of the firearm] I would've walked up out this bitch Tuesday. They couldn't have did shit. Damn! Fuck! Fuck!" Ex. 12A at 20:40-22:11; Ex. 12B. Individual A then yelled back:

> "Hey bro how was I gonna say that and it's on camera? *You tellin'* … You know what I'm saying? Don't start with me, okay? *Cause how the fuck am I gonna say some shit that you already said, though? … On tape!* … What are you talking about right now? … Listen to what I'm saying! … What the fuck is you talking about? … *Like they ain't got you saying that*

15

*shit!* … So what the fuck am I gonna say that shit for right there? … And the tape right there!"

Ex. 12A at 22:11-22:46; Ex. 12B (emphasis added). Defendant asked Individual A, "Why you hollering?" and Individual A responded, "I'm hollering because you just blew the fuck out of me! *Like I'm trying to do anything besides get you the fuck off!*"[8] Ex. 12A at 22:46-22:55; Ex. 12B (emphasis added). She then stated, "You know what the fuck happened!" Ex. 12A at 23:10; Ex. 12B.

In short, the anticipated testimony of the officers, as well as the recorded statements from defendant and Individual A, will establish that contrary to defendant's claims, defendant told Officer McDonald he had a firearm in his vehicle.[9]

Finally, defendant argues that as a matter of law, even if he *did* alert Officer McDonald to the presence of a firearm, that admission did not establish his possession was unlawful. *See* Dkt. 39 at 5-6. Pointing to *United States v. Watson*, 900 F.3d 892 (7th Cir. 2018), he claims that possessing a firearm in a vehicle is not illegal in Illinois if the owner holds a Firearm Owners Identification (FOID) card and the

---

[8] This blatant admission of Individual A's bias and motive, combined with her recorded statements, severely undermines the veracity of her statements to the defense's investigator. *See* Dkt. 39, Ex. D.

[9]    Even setting the presence of a firearm aside, the officers' observations of defendant burglarizing the Old Navy, him running to his vehicle with stolen merchandise before fleeing the scene, and the presence of additional contraband inside the CR-V, provided independent probable cause for the officers' search.

The government acknowledges the need for an evidentiary hearing. Despite the countervailing evidence, defendant maintains there was no stolen merchandise in his car and denies making incriminating statements to police. The officers will testify about their observations to the contrary, which, taken together, provided probable cause to believe both contraband and evidence of criminal activity were inside his vehicle.

firearm is unloaded and in a case, and that Officer McDonald did not observe the uncased firearm or establish defendant's FOID status prior to his search.

Before addressing the substantive flaws of defendant's theory, it is important to correct his erroneous portrayal of Officer McDonald's narrative. Defendant's motion unfairly states that Officer McDonald wrote in his written reports that he observed the firearm in plain view *prior* to entering to defendant's vehicle, then "change[d]," "amended," and "revised" his observations during a subsequent interview with the U.S. Attorney's Office. *See* Dkt. 39 at 2, 5, 6. Defendant goes so far as to inaccurately quote Officer McDonald's reports as stating that he "*immediately* observed a semi-automatic handgun in the center console uncased and immediately accessible." *Id.* at 5 (emphasis added). In truth, however, the relevant portion of Officer McDonald's report narrative states the following:

> OFFENDER STATED TO A/O'S, "I HAVE A WEAPON IN THE CAR."
> OFFENDER RELATED THE WEAPON WAS LOCATED NEAR THE
> DRIVER SIDE FLOOR OF THE VEHICLE. A/O MCDONALD #19423
> OBSERVED A SEMI-AUTOMATIC HANDGUN IN THE CENTER
> CUP HOLDER THAT WAS UNCASED AND IMMEDIATELY
> ACCESSIBLE AND LOADED WITH AN UNKNOWN NUMBER OF
> LIVE ROUNDS. A/O MCDONALD RECOVERED A WALTHER P22,
> DEFACED SERIAL NUMBER, .22 LONG RIFLE CALIBER,
> SEMIAUTOMATIC HANDGUN, 2.5IN BARREL, BLUE STEEL,
> MADE IN GERMANY, WHICH WAS INVENTORY #14713034.

Ex. 3. Contrary to defendant's assertion, Officer McDonald neither stated that he "immediately" saw the handgun, nor that he observed it prior to entering defendant's vehicle. As such, his version of events has not "change[d]," been "amended," or "revised." To the contrary, his subsequent interview was entirely consistent with his

original report, and the government anticipates that his testimony will be equally congruent.

Regardless, *Watson* is inapposite. That case addressed the reliability of an anonymous 911 tip about "boys playing with guns" in an Indiana parking lot, a situation not presented here. *See* 900 F.3d at 893 (internal quotation marks omitted). Moreover, gun possession laws are "much stricter" in Illinois than in Indiana, where *Watson* took place. *See United States v. Swinney*, 463 F. Supp. 3d 851, 857 (N.D. Ill. 2020) (Chang, J.) (distinguishing *Watson* on this basis). Under Illinois law, it would have been illegal for defendant to carry or possess a firearm in his vehicle, even with a FOID card, unless it was "unloaded and enclosed in a case." 720 Ill. Comp. Stat. 5/24-1(a)(4). Based upon defendant's comments to Officer McDonald and the surrounding circumstances—including the fact that defendant did not volunteer that he had a FOID card—it was reasonable for the officers to believe the gun he admitted to having in his vehicle was not unloaded, enclosed in a case, and possessed with the necessary documentation. *Cf. People v. Spain*, 163 N.E.3d 768, 779 (Ill. App. Ct. 2019), *appeal denied,* 147 N.E.3d 682 (Ill. 2020), *and cert. denied sub nom. Spain v. Illinois*, 141 S. Ct. 964 (2020) ("[A]n individual's choice not to volunteer that he has a concealed carry license when a gun is found on his person is an additional factor that police are entitled to take into account when they determine whether there is probable cause to arrest that individual and seize the gun ….").

Most importantly, by focusing solely upon his admission regarding the existence of a firearm, defendant ignores the myriad other facts demonstrating that

his possession was unlawful, including his presence at a scene of widespread looting, his violation of curfew, his own burglary and retail theft, and his initial flight from police. "When gun possession is paired with evasive or other suspicious conduct, probable cause can be found." *United States v. Williams*, No. 19 CR 00662-1, 2021 WL 25550, at \*8 (N.D. Ill. 2021) (Chang, J.). The court in *Williams* noted that, in addition to the suspected presence of a firearm, the defendant "sprinted away, thus engaging in the 'consummate act of evasion.'" *Id.* at \*9 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). According to the court, "[t]he flight suggested that [the defendant] had something to hide; otherwise, why run?" *Id.* The same reasoning applies here, where defendant fled from his vehicle upon the officers' arrival.

Likewise, the presence of firearms in conjunction with other criminal activity further supports a reasonable inference that the firearm may be contraband. *See, e.g. United States v. Cotton,* 420 F. Supp. 3d 777, 783-84 (N.D. Ill. 2019) (Ellis, J.) (noting that a tip involving "a person with a gun *and narcotics … together* plausibly indicate criminal activity" because "'[g]uns are tools of the drug trade'" (quoting *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009) (emphasis added))). Particularly relevant here, firearms are "a tool of the burglary trade and useful in protecting ill-gotten booty." *United States v. Hatfield*, 815 F.2d 1068, 1073 (6th Cir. 1987). "Burglars … have the same basic motives for possessing weapons that drug dealers do. First, they are in a dangerous business, and carry firearms to protect themselves. Second, they keep valuable goods … whether for sale or for personal consumption … and need to protect the goods." *United States v. Bater*, 830 F. Supp. 28, 41 (D. Mass.

19

1993). A similar association has been found between guns and stolen property. *See United States v. Hughes,* 940 F.2d 1125, 1126 (8th Cir. 1991) (upholding seizure of firearm discovered in plain view during execution of search warrant for stolen property, because "the officers had probable cause to associate the gun with criminal activity"). "[C]riminals are at a self-imposed disadvantage: if they are robbed, they can hardly complain to the authorities. Therefore, the presence of protective weapons in proximity to stolen goods suggests the sort of 'self-help' in which burglars engage to protect their goods." *Bater*, 830 F. Supp. at 41. In short, the present case involves the additional evidence of unlawful firearm possession that *Watson* lacked.

As a final aside, defendant's motion is contradictory on its own terms. As discussed above, he asserts "there was no basis to believe that stolen merchandise was in the car." Dkt. 39 at 8. Paradoxically, he also claims Officer McDonald could not have known the gun was "immediately accessible or uncased prior to searching the car" because he "only saw the firearm after entering the vehicle and moving items within," namely, "a large pile of stolen merchandise on the center console." *Id.* at 2, 5-6. Defendant cannot have it both ways. If, as he alleges, stolen merchandise was not present, then the officers would have seen an uncased—and therefore unlawful—firearm in plain view when they looked through the vehicle windows. On the other hand, if stolen merchandise *was* present and concealing the uncased firearm, then that fact further supported the officers' reasonable belief that contraband and evidence of criminal activity was inside the vehicle.

20

**B.     Officers Possessed a Reasonable Belief that Defendant was Dangerous and Might Gain Immediate Control of a Weapon.**

In addition to having probable cause to believe defendant's vehicle contained evidence of criminal activity, the testimony of the officers will establish that they possessed a reasonable belief he was dangerous and might gain access to the firearm inside. Under *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983), officers engaged in an investigative stop may search "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden," if they possess "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that [a] suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 88 (1968)). This is because an "arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity." *Id.* at 1050 n. 14.

The *Long* exception requires that officers have reasonable suspicion that an individual "was dangerous at the time they searched the car," and "could gain 'immediate control' of weapons in the vehicle." *United States v. Vaccaro*, 915 F.3d 431, 436 (7th Cir. 2019). Both are true here. Regarding the former, the officers' encounter with defendant occurred at night in a high-crime area, and during a period of heightened criminal activity. *See United States v. Patton*, 705 F.3d 734, 738 (7th Cir. 2013) (stating that "[t]he incidence of crime in the area" is "one factor which, in conjunction with … other circumstances …, contribute[s] to a reasonable suspicion

21

that [an individual] might be armed" (internal citations omitted)); *see also United States v. Brown*, 273 F.3d 747, 748 (7th Cir. 2001) ("A nighttime … stop, especially in an area where crime is not a stranger, is more fraught with potential danger to an officer than would be a stop during the light of day."). The officers also observed looting at Marshfield Plaza on May 30 that extended through the patrol leading to defendant's arrest, and specifically saw defendant engaged in burglary as they approached the Old Navy. "[S]ome crimes by their very nature are … suggestive of the presence and use of weapons." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007). This includes "burglary, a crime normally and reasonably expected to involve a weapon." *Id.* Defendant affirmed this likelihood when he told Officer McDonald he had a gun in his car.

The officers also reasonably believed defendant or Individual A could access the weapon inside defendant's vehicle. Neither had been arrested or handcuffed at the time Officer McDonald learned of the firearm. Thus, the circumstances were essentially the same as in *Long*, where the suspect was standing unrestrained "by the rear of the vehicle" at the time of the vehicle search. 463 U.S. at 1036. Defendant claims he could not gain immediate control of the gun because he was "outnumbered" and "not within reaching distance of the car." Dkt. 39 at 4. The number of officers in *Long*, however, also exceeded the vehicle occupants. 463 U.S. at 1035-36 (two officers compared to one vehicle occupant). The same is true in multiple cases applying the *Long* exception. *See, e.g., Vaccaro*, 915 F.3d at 434 (two officers compared to one vehicle occupant); *Valance v. Wisel*, 110 F.3d 1269, 1273 (7th Cir. 1997) (three officers

compared to one vehicle occupant); *United States v. Denney*, 771 F.2d 318, 319 (7th Cir. 1985) (multiple officers compared to one vehicle occupant). Furthermore, when the officers here arrived at Marshfield Plaza, they encountered numerous looters besides defendant in both the parking lot and the Old Navy. Defendant was also accompanied by Individual A when he returned to his vehicle. These facts made the scene far less secure than a traditional traffic stop. *See Long*, 463 U.S. at 1049 (noting the "especially hazardous" nature of "roadside encounters between police and suspects").

Defendant's position outside the vehicle also was not disqualifying. "[T]he Supreme Court has rejected the reasoning that because the occupants have exited the vehicle and are under the control of officers, the officers could not reasonably believe that they could gain immediate control of a weapon located inside the vehicle." *United States v. Holifield*, 956 F.2d 665, 669 (7th Cir. 1992) (citing *Long*, 463 U.S. at 1051). As the *Long* Court stated, "[j]ust as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile." *Id.* at 1051. "In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside," or, "the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons." *Id.* at 1051-52. Following this rationale, the Seventh Circuit has consistently upheld *Long* searches where the defendant was physically separated

from a car. *See, e.g.*, *Vaccaro*, 915 F.3d 437-38; *United States v. Arnold*, 388 F.3d 237, 241 (7th Cir. 2004); *United States v. Mancillas*, 183 F.3d 682, 700-01 (7th Cir. 1999); *United States v. Brown*, 133 F.3d 993, 998-99 (7th Cir. 1998); *United States v. Holifield*, 956 F.2d 665, 669 (7th Cir. 1992). The Court has even applied *Long* where a suspect was secured in the back of a squad car, *see Arnold*, 388 F.3d at 238, placed in handcuffs, *see United States v. Evans*, 994 F.2d 317, 319 (7th Cir. 1993), or both. *See Vaccaro*, 915 F.3d at 434. These cases emphasize that it is reasonable to believe a "defendant, who [is] not under arrest, could … regain[] access to his vehicle," and by extension, the firearm inside. *Vaccaro*, 915 F.3d at 437; *see also Arnold*, 388 F.3d at 241 (noting the possibility that "[the officer] may have permitted [the defendant] to gather items from the car before leaving the scene," or that the defendant, "who sat unhandcuffed in the back of the patrol car, could have broken away from [the officer's] control"). Such is the case here, where defendant held the keys to the CR-V, and neither he nor Individual A were arrested until after the gun was recovered. Indeed, Individual A *did* regain access to defendant's vehicle when the officers allowed her to leave the scene.

In sum, under the totality of the circumstances, an objective officer could have reasonably believed both defendant and Individual A were dangerous and could have

gained immediate control of a weapon. Accordingly, Officer McDonald's search of defendant's vehicle for a firearm was lawful.[10]

## IV. CONCLUSION

Officers had probable cause to believe defendant's vehicle contained contraband and evidence of criminal activity, as well as a reasonable belief that he was dangerous and might gain immediate control of a weapon. Their entry into defendant's vehicle was therefore lawful, and the government respectfully requests that this Court deny defendant's motion to suppress after an evidentiary hearing.

Dated: May 4, 2021

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ Paul Mower*
PAUL MOWER
Assistant United States Attorney
219 S. Dearborn St., Suite 500
Chicago, IL 60604

---

[10] *Long* occurred in the context of a traditional traffic stop, where officers observed the defendant inside a moving vehicle prior to their protective search. *See* 463 U.S. at 1035. Subsequent cases, however, have applied *Long* in a variety of other settings. When police first confronted the defendant in *Mancillas*, for example, he was parked in a nightclub parking lot, not traveling on the street. 183 F.3d at 686. Similarly, like defendant in this case, the suspect in *United States v. Boden* was already standing *outside* his parked vehicle when officers approached. 854 F.2d 983, 985, 987 (7th Cir. 1988). At bottom, a central principle underlying *Long* is that "suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed," and such a danger arises "from the possible presence of weapons *in the area surrounding a suspect*." 463 U.S. at 1048, 1050 (emphasis added). *Long* applied this precept where the "surrounding area" was an automobile, but its progeny have cited *Long* and invoked the same tenet in affirming protective searches of other locations. *See, e.g., United States v. Richmond*, 924 F.3d 404, 413-16 (7th Cir. 2019) (area between front door and screen door of defendant's residence); *Cady v. Sheahan*, 467 F.3d 1057, 1062 (7th Cir. 2006) (briefcase held by defendant at time of stop); *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995) (protective sweep of defendant's home in conjunction with arrest).